OPINION
{¶ 1} Defendant-appellant Bryce Taylor, a juvenile, appeals the judgment of the Licking County Court of Common Pleas, Juvenile Division, adjudicating him a delinquent child by reason of having committed the offenses of rape and gross sexual imposition.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On April 6, 2004, the Licking County Sheriff's Office received information alleging appellant made unwanted and unlawful sexual advances toward a juvenile female while riding on the school bus throughout the 2001-2002 school year. On May 19, 2004, Detective Slayman from the Licking County Sheriff's Department interviewed appellant. Appellant agreed to a taped statement of the interview. During the interview, appellant admitted to inserting his finger into the victim's vagina and touching her breasts, giving specifics regarding the touching. Appellant denied making threats to the victim, but later admitted he told her he would restrain her in a place where she could see her home and would not be able to scream for help.
 {¶ 3} On June 30, 2004, appellant was charged with one count of rape and two counts of gross sexual imposition, in violation of O.R.C.2907.02(A)(1)(b), 2907.05(A)(4) as applied to adults and 2152.02(F) as applied to juveniles. The trial court conducted an adjudicatory hearing on September 1, 2004. In addition to his father's attendance, appellant was represented by counsel and a guardian ad litem at the hearing.
 {¶ 4} At the adjudicatory hearing, the state presented the testimony of Detective Slayman, the victim and several other students who were either friends or acquaintances of the victim or appellant or who rode the school bus on which the conduct occurred.
 {¶ 5} Following the adjudicatory hearing, the trial court found appellant guilty on all counts and determined appellant to be a delinquent child. The trial court committed appellant to the Ohio Department of Youth Services for three years on Count I and concurrent six months sentences on Counts II and III, with the sentence on Count I running consecutive to the sentences on Counts II and III. The court held the sentences in abeyance pending appellant's performance on probation.
 {¶ 6} Appellant now appeals, assigning the following as error:
 {¶ 7} "I. THE TRIAL COURT COMMITTED HARMFUL ERROR IN ALLOWING THE INTRODUCTION OF INADMISSIBLE EVIDENCE THROUGHOUT THE ADJUDICATION OF THE INSTANT MATTER.
 {¶ 8} "II. THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL DUE TO THE FAILURE OF COUNSEL BELOW TO FILE A TIMELY AND MERITORIOUS MOTION TO SUPPRESS THE STATEMENT ATTRIBUTED TO THE ACCUSED.
 {¶ 9} "III. THE ADJUDICATION OF THE APPELLANT AS A DELINQUENT CHILD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED DURING THE ADJUDICATORY HEARING BELOW."
 I {¶ 10} In his first assignment of error, appellant maintains the trial court committed harmful error in allowing the introduction of inadmissible evidence at the hearing. Specifically, appellant cites testimony by witnesses as to out of court accounts provided by the victim of the events in question.
 {¶ 11} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 12} The following exchange took place at the adjudicatory hearing:
 {¶ 13} DETECTIVE SLAYMAN: "A. I had made contact with Ashley's parents first and we set an appointment date at Children's Services for the social worker, Nicole Dobson in this case, and I to interview Ashley.
 {¶ 14} "Q. Did you interview Ashley?
 {¶ 15} "A. Yes.
 {¶ 16} "Q. Okay. When did you interview her?
 {¶ 17} "A. I believe it was April 15th Nicole Dobson and I interviewed Ashley at Licking County Children's Services.
* * *
 {¶ 18} "Q. When you first talked with Ashley what were you — what were you trying to obtain from her?
 {¶ 19} "A. I was trying to obtain her statement.
 {¶ 20} "Q. Okay. Were you able to obtain a statement from Ashley?
 {¶ 21} "A. Yes, I was.
 {¶ 22} "Q. Okay. And during the course of speaking with Ashley what did you do in your investigation; what information did you come across in your investigation?
 {¶ 23} "A. The information that Ashley provided indicated that there were some . . .
 {¶ 24} "MR. STANSBURY: Again objection, Your Honor. Hearsay.
 {¶ 25} "THE COURT: I'll let the witness continue and at this time overrule your objection. If the substance of this witness's testimony relates exclusively to the allegations that were made, the Court will not accept the testimony for purposes of the proof of the matter asserted. But again will allow the prosecutor to proceed in terms of what it is that the detective was investigating, the substance of the allegations, and will refer to them as allegations and nothing more. So you may proceed with your — your direct examination.
 {¶ 26} "A. The — the allegations indicated that Bryce Taylor had forced sexual contact and conduct on Ashley on the school bus primarily in the mornings during a good — the majority of the 2001-2002 school year. It also included some witnesses that Ashley had disclosed information about those incidences to and my investigation included interviewing other students that had at least some knowledge of the allegations.
 {¶ 27} "Q. Okay. Were you able to develop a time line in this case; do you normally do that in a case like this?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. Okay. Were you able to talk with Ashley about a time line?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. Okay. What type of a time line did you come up with in this case?
 {¶ 32} "A. The time line she was fairly certain, although she does not of course have an exact date, she was fairly certain that the . . .
 {¶ 33} "MR. STANSBURY: Again, Your Honor, I'm going to object. He's now getting into substance of issues as to time, place, and manner of these allegations and it is classic hearsay and therefore inadmissible.
 {¶ 34} "THE COURT: Yeah. For the same reasons I — I made my ruling at the last objection, the Court will allow the testimony not for the proof of the matter asserted but rather to continue to establish a foundation. Again it is expected that this witness is going to testify as to the allegations which goes beyond the specific alleged sexual improprieties or conduct but also includes the — the — the time frame. Again the Court will not consider this testimony for the matter asserted because the victim herself is expected to testify, but the Court will use it for — for other purposes to establish that foundation. So you may proceed to your next question." Tr. at 16-20.
 {¶ 35} Later in Detective Slayman's testimony, he discussed interviewing appellant:
 {¶ 36} "A. I — I continued to — I asked him about other relevant events, including if — if threats, if you will, that he made to her regarding harming her younger brother. At that time, infant brother. He acknowledged bringing it up but not the specifics of what he said in regards to the younger brother. I also questioned him about the statement he made about telling Ashley that he would restrain her physically in the woods close to her house to where she would be able to see her house but not get there or be able to even scream for help. He acknowledged saying something to that effect. Couldn't give me a direct quote, but acknowledged that on I believe two occasions during the interview, but would not give me any justification as to why he said that, what he meant by that. Questioned him about the hallway incident.
 {¶ 37} "Q. Now when you say the hallway incident . . .
 {¶ 38} "A. Right. The hallway incident took place on May 7th, which was during the middle of the investigation at school. Before school Ashley was speaking with Jim Clary and Ruth Parlet in the hallway. Bryce . . .
 {¶ 39} "MR. STANSBURY: I'm going to object to this response on the basis that this is outside of the witness's personal knowledge.
 {¶ 40} "THE COURT: Sustained. Well, no. I'll allow it at this time. You may wish to renew your objection." Tr. at 59-60.
 {¶ 41} Upon review, the trial court properly considered the testimony for purposes other than as proof of the matter asserted. The trial court did not abuse its discretion in admitting the testimony as foundation evidence. Detective Slayman testified as to his own investigation and appellant's own statements. Furthermore, appellant had ample opportunity to challenge the statements at the hearing during the victim's testimony.
 {¶ 42} Appellant also cites the alleged victim's testimony at the adjudicatory hearing regarding journal entries she prepared, arguing the trial court improperly allowed the same:
 {¶ 43} "THE COURT: "A. We had a journal we had to write in class and one of the subjects was something we wished we could tell our parents and that's what I wrote on.
 {¶ 44} "MS. WELCH: Okay. May I approach the witness, your Honor?
 {¶ 45} "THE COURT: Yes.
 {¶ 46} "Q. I'm handing you what's been marked State's exhibit D and State's exhibit E. Can you take a look at those and tell the Court what those are?
 {¶ 47} "A. These are the journal entries that I wrote to Ms. Ewing.
 {¶ 48} "Q. Okay. The one that's been marked State's Exhibit D, what is the date on that one?
 {¶ 49} "A. 9/5/03.
 {¶ 50} "Q. Okay. And what about E.?
 {¶ 51} "A. 9/8/03.
 {¶ 52} "Q. Okay. Is it fair to say they were written — one was written after the other?
 {¶ 53} "A. Yes.
 {¶ 54} "Q. Okay. When you were writing that memo, is that what you call it, a memo or a — what did you call it exactly?
 {¶ 55} "A. It was our journals. We just wrote in it.
 {¶ 56} "Q. Okay. When you were writing the journal . . .
 {¶ 57} "A. Uh huh.
 {¶ 58} "Q. . . . what type of things were you thinking about?
 {¶ 59} "MR. STANSBURY: Objection, Your Honor. I'm going to object to that question based on relevancy and the allusion to these journals on the basis of hearsay.
 {¶ 60} "THE COURT: Overruled.
* * *
 {¶ 61} "MR. STANSBURY: Your Honor, we're going to object to those based on the hearsay basis in that first and foremost no testimony was — was developed from the exhibits other than to — to indicate their existence. Furthermore, they are in fact out-of-court statements made to or offered to prove the truth of the matter asserted and squarely fall within the hearsay exception.
 {¶ 62} "THE COURT: I — I'm — I'm puzzled. How are they hearsay? The victim testified that both D and E were her products, things that she personally wrote in a journal. So with regard to your objection to hearsay, how — how are they hearsay?
 {¶ 63} "MR. STANSBURY: They're hearsay because they are out-of-court statements made by a declarant being offered to prove the truth of the matter asserted, meaning that they are being offered to prove the truth of these allegations against my client. Just because they were her own words does not necessarily exempt them from the hearsay rule.
 {¶ 64} "THE COURT: I understand your — your argument. State's exhibit D and E will be admitted, not for the truthfulness of the matter asserted, but they'll be admitted for another purpose. The issue was raised — the issue was raised as to why the defendant did not report — immediately report what had occurred to her to her parents, to law enforcement, to teachers, other persons, and that was a defense issue that was covered under cross-examination. And the — these exhibits have a probative value in answering that question. So they'll be admitted for that purpose and that purpose alone. Again not for the substantive matters . . .
* * *
 {¶ 65} "MR. STANSBURY: I do. I don't believe that I cross-examined Ms. Frasher about the — the delay. I — asked her about dates but obviously the State's offering these based on its own interpretation of the time line here and, absent a showing of surprise, I don't think that they should be able to — to try to bootstrap their own — their own arguments.
 {¶ 66} "THE COURT: Okay. But I'll allow — allow — I'll allow those exhibits to be admitted for the specified purpose of which I indicated on the record." Tr. at 134-135, 189-192.
 {¶ 67} Upon review the trial court properly limited its consideration of the evidence, and did not abuse its discretion in admitting the same. Again, appellant had ample opportunity to cross-examine the witness regarding the journal entries. Further, the trial court noted the evidence was offered to rebut an issue raised by appellant in his defense, not for the truth of the matter asserted. The first assignment of error is overruled.
 II {¶ 68} In the second assignment of error, appellant argues he was denied the effective assistance of counsel due to his trial counsel's failure to file a timely and meritorious motion to suppress a statement attributed to appellant.
 {¶ 69} In evaluating an ineffective assistance of counsel claim, this Court employs a two step process as described in Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client."State v. Bradley (1989), 42 Ohio St.3d 136, 141, 538 N.E.2d 373; Statev. Lytle (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623. Second, Appellant must demonstrate prejudice by showing that there is a reasonable probability that the outcome of his trial would have been different, but for his counsel's unprofessional errors. Strickland v. Washington
(1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 70} Specifically, appellant argues he was denied the effective assistance of his trial counsel due to counsel's failure to timely file a motion to suppress statements appellant provided to a detective during a custodial interrogation. Appellant maintains the statement was obtained without the benefit of a Miranda warning and without the assistance of counsel.
 {¶ 71} At the time of the statement, appellant was separated from his parent and in a private office at the police station. The officers questioned appellant behind a closed door in a meeting room.
 {¶ 72} Detective Chris Slayman testified at the hearing:
 {¶ 73} "Q. Did you meet with the defendant on May 19th?
 {¶ 74} "A. Yes, I did.
 {¶ 75} "Q. Okay. Where did you meet?
 {¶ 76} "A. At the sheriff's office in my office.
* * *
 {¶ 77} "A. I first asked to speak with Mr. Watson in private with — Detective Brown was present. And explained to him that I wan — wished to question his son about some sexual allegation made against him by Ashley Frasher. He gave me verbal consent, permission to conduct the interview in private. I escorted him back to the lobby I believe and Bryce back to my office.
 {¶ 78} "Q. Okay. Was Bryce under arrest?
 {¶ 79} "A. No, he was not.
 {¶ 80} "Q. Okay. Was he ever placed in custody?
 {¶ 81} "A. No, he was not.
 {¶ 82} "Q. Okay. Was that explained to him?
 {¶ 83} "A. Yes. It's standard. Every suspect interview that I conduct, including this one. Not every, but in this type situation where I ask someone to come to the office, I explain that it's a non-custodial interview.
 {¶ 84} "MR. STANSBURY: Your Honor, I'm going to object to this based on relevance. This has nothing to do with the interview conducted with Mr. Taylor.
 {¶ 85} "THE COURT: There has been no motion to suppress that has been filed. That's why I'm just wondering the purpose of delving into theses issues if they are in fact non-issues.
 {¶ 86} "MS. WELCH: I . . .
 {¶ 87} "MR. STANSBURY: I — it — it's an issue to the point, Your Honor, that I believe the witness is attempting to bolster the correctness or — or routineness of the interview by alluding to what proper normal procedures are. The only thing that's relevant to this particular adjudicatory hearing is what the detective did with Bryce Taylor on the day in question.
 {¶ 88} "THE COURT: Madam prosecutor, do you have a response?
 {¶ 89} "MS. WELCH: I do not, Your Honor.
 {¶ 90} "THE COURT: Let's go ahead and proceed then.
* * *
 {¶ 91} "Q. Detective Slayman, I'll — I'll just ask you to the point was procedure followed in this case when you interviewed Bryce Taylor?
 {¶ 92} "A. Yes.
 {¶ 93} "Q. And when you started to conduct the interview, who was present when you first talked with Bryce alone?
 {¶ 94} "A. Detective Tom Brown.
 {¶ 95} "Q. Okay. And what happened when you first talked with him alone?
 {¶ 96} "A. When I first spoke with him alone the first thing I advised him was that he was free to leave at any time or stop answering my questions. He stated he understood. Then I began to explain the allegations that Ashley had made about events on the school bus in the 2001-2002 school year. Would you like me to continue or . . .
 {¶ 97} "Q. How did he react?
 {¶ 98} "A. At first he denied any contact, sexual contact, with Ashley. That changed over a few — the course of a few minutes. His first admission was indicated that he may have touched Ashley's breasts accidentally on more than one occasion, including not only over the — the thing but also under the shirt and under the bra accidentally.
 {¶ 99} "Q. Okay.
 {¶ 100} "A. That progressed into him acknowledging that he put his hand down the front of her pants while they were both in a seated position on the school bus, on one occasion feeling her pubic hair. Was unsure whether or not he made any digital penetration. Stated that it was possible that he did. If Ashley reported that, then it may have happened.
 {¶ 101} "Q. Okay.
 {¶ 102} "A. I — I continued to — I asked him about other relevant events, including if — if threats, if you will, that he made to her regarding harming her younger brother. At that time, infant brother. He acknowledged bringing it up but not the specifics of what he said in regards to the younger brother. I also questioned him about the statement he made about telling Ashley that he would restrain her physically in the woods close to her house to where she would be able to see her house but not get there or be able to even scream for help. He acknowledged saying something to that effect. Couldn't give me a direct quote, but acknowledged that on I believe two occasions during the interview, but would not give me any justification as to why he said that, what he meant by that. Questioned him about the hallway incident.
* * *
 {¶ 103} "A. And a comment which Bryce acknowledged in my interview was made to Ashley to the effect of you've never done anything about it before, why would you do anything about it now. Paraphrasing.
 {¶ 104} "Q. Okay. Bryce told you that he said that?
 {¶ 105} "A. Yes.
 {¶ 106} "Q. Alright. Did you inquire why he said that?
 {¶ 107} "A. Yes. I — I asked him more than once what he could have meant by that, whether he was trying to just play around, scare her, joke with her. I did not get in my opinion a clear just — justification as to why he said that.
 {¶ 108} "Q. Okay.
 {¶ 109} "A. Was very vague.
 {¶ 110} "Q. When you — you — you testified that when you initially spoke with Bryce he was denying what happened?
 {¶ 111} "A. Correct.
 {¶ 112} "Q. Okay. And then you said a few minutes passed and then he started opening up, is that your testimony?
 {¶ 113} "A. Correct.
 {¶ 114} "Q. How would you explain to the Court the change? I guess, what did you see or what was said that may have changed his demeanor?
 {¶ 115} "A. I offered him an explanation, possible explanation, for his behavior with Ashley in asking him if he had a romantic or sexual attraction to her . . .
 {¶ 116} "Q. Okay.
 {¶ 117} "A. . . . that could have prompted his advances.
 {¶ 118} "Q. Okay. Why did you do that?
 {¶ 119} "A. I acknowledged that or, excuse me. I — I — I — suggested that in an effort to have him acknowledge his actions.
 {¶ 120} "Q. Okay. And did that work?
 {¶ 121} "A. Yes." Tr. at 55-62.
 {¶ 122} The State then introduced the audiotaped statement which evidenced the following exchange:
 {¶ 123} "SLAYMAN: Before we — as soon as you came back to my office, before we started talking, did I tell you that you weren't under arrest or — or anything like that and that you were free to leave or stop answering questions if you wished?
 {¶ 124} "BRYCE: Yes.
 {¶ 125} "SLAYMAN: Okay. Did you give your statement voluntarily . . .
 {¶ 126} "BRYCE: Yes.
 {¶ 127} "SLAYMAN: . . . to me? Did I promise you or threaten you in any way to get you to talk to me?
 {¶ 128} "BRYCE: No. Tr. at 64.
 {¶ 129} With regard to the introduction of the testimony, the trial court found:
 {¶ 130} "The Court does place great credibility on the victim's statements. The Court does believe the victim's testimony. And you're right, Mr. Stansbury, this is a he-said she-said and he-said-again. The Court cannot fathom this young man admitting to those things that he was accused of based upon the type of interview that Detective Slayman conducted. The — Court, even though there was not motion to suppress, the Court cannot find any coercion, coercive tactics, browbeating, depravation of food or water. The — the Court cannot fathom any type of coercion by law enforcement. The Court believes that the statements made by — by the boy were generally truthful at the time that the tape recorded conversations was made at the interview at the sheriff's department. Again the Court is going to enter an adjudication of delinquency."
 {¶ 131} Based on the above, appellant has not demonstrated prejudice from his trial counsel's failure to file a motion to suppress the statements. The trial court clearly had discretion to admit the statement into evidence given the voluntarily nature of the same and Detective Slayman's testimony regarding the nature of the interview. Detective Slayman's testimony demonstrates appellant's statement was voluntary, uncoerced and not subject to suppression.
 {¶ 132} Appellant's second assignment of error is overruled.
 III {¶ 133} Appellant's third assignment of error asserts his adjudication as a delinquent child is against the manifest weight of the evidence.
 {¶ 134} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541 citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1, 10 Ohio St.2d 230,227 N.E.2d 212.
 {¶ 135} Upon review of the evidence noted, supra and based upon our disposition of appellant's first and second assignments of error, we find there was competent, credible evidence supporting appellant's adjudication of delinquency. Appellant's admission he engaged in sexual conduct with the victim was corroborated by witness testimony, including the testimony of the victim herself.
 {¶ 136} Appellant's third assignment of error is overruled.
 {¶ 137} The judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed.
Hoffman, J., Boggins, P.J. and Farmer, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to appellant.